*W. W. Cover* and *T. A. Green*, for plaintiff.

*E. O. Wolcott*, for defendant.

## MINES AND MINERALS.

### NEILS LARSON ET AL.

LOCATION—DISCOVERY—PLAT OF SURVEY.    Consideration of the points presented by protestants against issue of patent in this case.

VEIN.    Several definitions of a vein or lode presented.

DEPARTMENT OF THE INTERIOR, GENERAL LAND OFFICE,
WASHINGTON, D. C., Feb. 28, 1882.

REGISTER AND RECEIVER, *Leadville, Colorado.*

GENTLEMEN:    I have examined the testimony taken before you at the hearing ordered by my predecessor, March 13, 1880, upon the protest of Robert Boraem, against the issue of a patent to Neils Larson *et al.*, for the Shamus O'Brien lode.

The affidavits in support of the protest raised the following points:

1.    That the boundaries of the Shamus O'Brien location were not marked upon the ground.    2.    That there was no discovery of a ledge or vein within the said claim, prior to location or application for patent.    3.    That the plat of survey and notice of intention to apply for patent were not posted in a conspicuous place upon the claim.    4.    That the certificate of location did not contain such a description of the claim as would serve to identify the same.    5.    That the discovery shaft was not sunk to

a sufficient depth to show a vein or lode; and, 6. That such shaft is not located midway between the side lines of the claim; and a hearing was ordered to determine these questions.

The hearing of testimony was commenced before you August 10, 1880, and on the 7th of March, 1881, you rendered your joint opinion "that the protestant had failed to maintain his allegations; that, therefore, the protest should be dismissed, and that patents should issue to applicants," etc.

At the hearing C. C. Davis, publisher of the Leadville *Chronicle*, testified that the notice of application for patent was published in the weekly edition of said paper from October 4th to December 6, 1879. The testimony shows that the plat of survey and the notice of intention to apply for patent were posted on the claim from October 3d to December 14, 1879.

During this period no adverse claim was filed against the Shamus O'Brien application, and it must be assumed that none existed. Boraem *et al.* appear as protestants merely, and a large amount of testimony has been taken to show that the applicants have failed to comply with the terms of the law.

The burden of proof is assumed by protestants.

Upon the first point of protest, I find that the testimony in support of the allegation is entirely negative in character, whereas the testimony introduced by the applicants for patent shows that the location upon the ground was regularly made, and that the stakes were so set that the lines thereof could be readily traced. Nyce, U. S. Deputy Mineral Surveyor, testifies that he surveyed the O'Brien claim in August and September, 1879, and found five of the six location stakes standing, to wit: Stakes 1, 2, 3, 5 and 6.

To the second and fifth points of objection, which will be considered together, the evidence is principally directed. At the date of the hearing the shaft had been sunk in the Shamus O'Brien claim to the depth of about 310 feet. The first 165 feet was through wash material, the succeeding 110 feet was through porphyry, and at the depth of about 275 feet, what is styled by the witnesses for the applicants for patent as the "contact," or "crevice" matter was reached.

Upon the finding as to the character of this contact matter depends the validity of the location.

This contact matter was discovered in the discovery shaft about the 15th of January, and upon assays thereof, which it is

stated show the existence of mineral, the location was based, dated February 22, 1879.

The only assays of which any record was made, or which are evidenced by the certificate of the assayer, were made after the date of location; but from the evidence of Larson, one of the locators, Woodward and James, the assayers, are satisfied that numerous assays were made prior to location of the matter contained in the shaft, which showed that the same carried from $2\frac{1}{2}$ to 13 ounces silver to the ton of ore. There is no legal obligation upon the locator to cause an assay to be made of the mineral which he claimed to have discovered within his location. Such assay is only an element of the proof to sustain the legality of the location.

Since the location, drifts have been run on this so-styled contact matter in an easterly direction over 100 feet, and in a westerly direction about 50 feet. These drifts show a substance of the same general character as that discovered in the shaft.

This contact matter consists of a clay material intermixed with a harder substance containing the mineral.

Admitting that this matter contains mineral to a small extent, the protestants urge that it is not a continuous body, and because it does not rest upon a foot-wall of limestone, as usually occurs at Leadville, the discovery in the Shamus O'Brien shaft is not of a vein or lode of quartz, or other rock in place, bearing gold, silver, etc.

It is shown in this case that the contact or crevice referred to lays between two walls of solid rock.

The Courts have frequently passed upon the question as to what constitutes a vein or lode within the meaning of the mining law, and I quote the following judicial definitions:

In the Eureka case (4 Saw., 302) Judge Field decided: "These acts (of Congress) give no definition of the term (lode). They use it always in connection with the term vein. * * * The definition of a lode given by geologists is that of a fissure in the earth's crust filled with mineral matter, or more accurately, as aggregations of mineral matter containing ores in fissures. (See Von Cotta's Treatise on Ore Deposits, Prime's Translation, 26). But miners used the term before geologists attempted to give it a definition. * * * Cinnabar is not found in any fissure of the earth's crust, or in any lode as defined by geologists; yet the

acts of Congress speak, as already seen, of lodes of quartz or rock in place, bearing cinnabar. Any definition of lode as there used, which did not embrace deposits of cinnabar, would be as defective as if it did not embrace deposits of gold and silver. The definition must apply to deposits of all the metals named, if it apply to deposits of any one of them. Those acts were not drawn by geologists or for geologists; they were not framed in the interests of science, and consequently with scientific accuracy in the use of terms. They were framed for the protection of miners in the claims which they had located and developed, and should receive such a construction as will carry out this purpose."

"It is difficult to give any definition of the term, as understood and used in the act of Congress, which will not be subject to criticism. A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature, in which the mineral is deposited, would seem to be essential to the definition of a lode, in the judgment of geologists. But to the practical miner, the fissure and wall are only of importance as *indicating the boundaries within which he may look for and reasonably expect to find the ore he seeks.* A continuous body of mineralized rock lying within any other well defined boundaries on the earth's surface and under it, would equally constitute in his eyes a lode. We are of opinion, therefore, that the term as used in the acts of Congress is applicable to *any zone or belt of mineralized rock lying within the boundaries clearly separating it from the neighboring rock.*"

"It includes   *   *   *   all deposits of mineral matter found through a mineralized zone or belt, coming from the same source, impressed with the same forms, and appearing to have been created by the same process."

In the *Jupiter Mining Co.* v. *Bodie Con. Mining Co.*, (Copp's Land Owner, vol. 8, p. 60), Judge Sawyer, in his charge to the jury, stated: "It is only necessary to discover a genuine mineral vein or lode, whether small or large, rich or poor, at the point of discovery within the lines of the claim located, to entitle the miner to make a valid location including the vein or lode.'"

"A vein or lode authorized to be located is a seam or fissure in the earth's crust, filled with quartz or with some other kind of rock in place, carrying gold, silver, or other valuable mineral deposits named in the statute. It is not enough to discover detached pieces of quartz, or mere bunches of quartz, not in place."

In *Van Zandt* v. *Argentine Mining Company* (Copp's Land Owner, vol. 8, p. 126), Judge Hallett, in his charge to the jury, stated: "It is important to consider whether it (the ore) existed in mass and position, or in other words, in the form of a vein or lode; or, on the other hand, in a broken or fragmentary condition, intermingled with the slide and *debris* on the *surface* of the mountain. * * * Of course, if ore was found in the discovery shaft, and the ore so found was broken and fragmentary, it cannot be said that a body of ore—a vein or lode—was found in that shaft." * * *

Judge Hallett, in his charge to the jury in the case of the *Iron Silver Mining Co.* v. *Cheeseman* (Copp's Land Owner, vol. 8, p. 83), said: "It is enough to say that a vein or lode is a body of mineral, or mineral-bearing rock within defined boundaries in the general mass of the mountains."

The same Court, in the *Iron Mine* v. *The Smuggler* (newspaper slip), add to the above, "You will observe that the elements of this definition are, (1) A body of mineral bearing rock; and, (2), the boundaries of it. With either of these elements well established, very slight evidence as to the existence of the other may be accepted upon proof of a body of mineral or mineral-bearing rock, clearly distinguishable 'from the mass of the mountain;' to the extent of it, the existence of the boundaries is implied. The illustration of that proposition is found in the large bodies of mineral or ore in each of these claims, the existence of which is shown by the evidence of both parties. In saying that such bodies exist, we necessarily affirm that they have boundaries. * * * On the other hand, and with well-defined boundaries, very slight evidences of ore within these boundaries will establish the existence of the lode. An illustration of that proposition is found in a fissure with a cavity clearly marked. If we find in such a fissure ore *here and there*, although at considerable distances, and sometimes foreign to the inclosing walls in the intermediate spaces, we accept it as a lode and vein without hesitation." * * *

"All that has been said by witnesses about rock in place, is valuable only as it tends to prove or disprove the existence of a crevice or opening in the rocks with valuable mineral therein. Excluding the wash, slide and debris on the surface, and referring only to the mass of the mountain, all things are in place

when found in the position in which they were created.   *When regular and homogeneous, it may be assumed that they are in that position.*"

From the testimony I find that, prior to the location of the Shamus O'Brien claim, there was discovered within the bounda-ries thereof, a vein or lode of mineral-bearing rock.   Before the location a shaft had been sunk, not only through the debris and wash of the surface, but through 110 feet of solid country rock; and thereafter followed the lode, which is situated between two walls of rock well-defined.

That the ore deposit does not rest upon a foot-wall of lime-stone, as usually found in mining claims at Leadville, I do not deem it absolutely essential to the validity of the location.   As a matter of fact, I find that there has been discovered within this location a *continuous* body of ore containing silver, and lying be-tween well-defined walls of rock, answering to the definition of a *lode* contained in the decision quoted.

I do not discover any objection to the manner in which the plat of survey and the notice of the application for patent were posted upon the claim.   It is shown that a pile of timbers was placed before the notice, but not to a sufficient height to obstruct a view of the notice and plat to any person passing along the road or trail.   They were not placed there, and the notice was not posted in such a manner as to intentionally deceive or prevent notice being given.

Several witnesses testify to having seen the notice and plat posted nearly every day during the period of posting, and from its position, being in an open box upon the side of the shaft-house towards the road and boarding house, I find that such no-tice and plat were conspicuously posted.

In regard to the objection that the certificate of location did not contain such a description as would identify the claim, as has been stated, the location was marked upon the ground by stakes, all of which remained in position at the date of the survey for patent.   It is not alleged that any person has been misled by the certificates of location, and they certainly contained such de-scription as would put an interested inquirer upon notice.

Two of the location stakes were set within the limits of a pre-viously located claim, but the final survey avoids conflict with such prior location, and embraces territory wholly within the

limits of its own location. This is a customary and approved practice, and if it had not been followed in this case, would have subjected the application to adverse claim or protest on that account.

It is also urged that because the side lines of the claim are of unequal length, the end lines, while represented upon the plat and stated to be parallel, cannot in fact be so. This would be true if the side lines were parallel, but it is shown that they are not.

I do not intend to pass upon the regularity of the survey of the claim at this time, further than to overrule the objections raised in the protest.

It is shown that the discovery shaft is not located midway between the side lines of the claim, but since location it has been shown by actual development that the vein is located under the middle of the claim at the surface. In the absence of an adverse claim, this may be shown prior to the issue of patent.

I do not discover any serious objection to entry by the applicants for the Shamus O'Brien lode. When the proofs have been received for that purpose, a careful examination thereof will be made.

The protest is dismissed, and your action is approved.

N. C. McFARLAND, <em>Commissioner.</em>